# EXHIBIT A

LAW OFFICES
# MARKOWITZ & RICHMAN
1100 NORTH AMERICAN BUILDING
121 SOUTH BROAD STREET
PHILADELPHIA, PENNSYLVANIA 19107
———
(215) 875-3100
TELECOPIER (215) 790-0668
WWW.MARKOWITZANDRICHMAN.COM
DIRECT DIAL
215-875-3111

January 11, 2007

RICHARD H. MARKOWITZ *
STEPHEN C. RICHMAN *
PAULA R. MARKOWITZ
QUINTES D. TAGLIOLI
JONATHAN WALTERS ++
ANTHONY C. BUSILLO II
THOMAS H. KOHN ***
RUTH SKOGLUND
R. MATTHEW PETTIGREW, JR. **
PETER H. DEMKOVITZ +
MATTHEW D. AREMAN +

    * ALSO ADMITTED IN NEW YORK
      AND DISTRICT OF COLUMBIA
    + ALSO ADMITTED IN NEW JERSEY
   ++ ALSO ADMITTED IN DISTRICT OF COLUMBIA
   ** ALSO ADMITTED IN NEW JERSEY AND NEW YORK
  *** ALSO ADMITTED IN VIRGINIA
      AND DISTRICT OF COLUMBIA

ALLENTOWN OFFICE
SUITE 200 COMMONWEALTH BLDG.
512 HAMILTON STREET
ALLENTOWN, PA 18101-1505
(610) 820-9531

NEW JERSEY OFFICE
24 WILKINS AVENUE
HADDONFIELD, NJ 08033
(856) 616-2930

NEW YORK OFFICE
880 THIRD AVENUE
NINTH FLOOR
NEW YORK, NY 10022
(212) 752-6761

HARRISBURG OFFICE
27 SOUTH ARLENE STREET
P.O. BOX 6865
HARRISBURG, PA 17112-6865
(717) 541-9475

Mr. Charles Dougherty
United States Rebar, Inc.
332 North Main Street
Freeport, NY 11520

PI-46-02

RE:   **Withdrawal Liability Determination**

Dear Mr. Dougherty:

The Board of Trustees of the Metal Lathers Local 46 Pension Plan ("the Plan") has assessed withdrawal liability against United States Rebar and its affiliated or controlled concerns under the Employee Retirement Income Security Act ("ERISA"), as amended by the Multi-Employer Pension Plan Amendments Act of 1980 ("MEPPAA").

United States Rebar underwent a complete withdrawal from the Pension Plan in July of 2005. Yet, US Rebar and/or its affiliated or controlled concerns continues to perform work of the prior collective bargaining agreement of the type for which contributions were previously required. Thus, a withdrawal has occurred within the meaning of 29 USC 1383(b)(2).

United States Rebar's share of withdrawal liability is $3,408,247.00. This amount is determined based on United States Rebar's pro-rata share of total contributions to the Plan during the ten years ending on December 31, 2004.

This liability may be satisfied by monthly payments for twenty-seven months in the amount of $132,043.82, plus a final payment of $31,609.00.

If United States Rebar is delinquent in making any of its required monthly payments, interest will be added to the delinquencies.

01/16/2007 16:08 IFAX                                    ⇒ Kim                    ☒002/002

Mr. Charles Dougherty
January 11, 2007
Page 2

    The Trustees look forward to the receipt of the first monthly contribution of $132,043.82 on or before sixty (60) days after the date of this letter, which would be April 1, 2007; to twenty-six consecutive monthly payments in that amount thereafter, and a final payment of $31,609.00.

    Should there be any questions, please contact the undersigned.

                Very truly yours,

                RICHARD H. MARKOWITZ

RHM/kb

# EXHIBIT B

# Buchanan Ingersoll & Rooney pc
#### Attorneys & Government Relations Professionals

James J. Sullivan, Jr.
215 665 5341
james.sullivan@bipc.com

1835 Market Street, 14th Floor
Philadelphia, Pennsylvania 19103-2985

T 215 665 8700
F 215 665 8760

www.buchananingersoll.com

February 2, 2007

Board of Trustees of the Metal Lathers Local 46 Pension Plan
c/o Richard H. Markowitz, Esq.
Markowitz & Richman
1100 North American Building
121 South Broad Street
Philadelphia, PA 19107

Re:    Request for Reconsideration of Withdrawal Liability Determination Regarding United
        States Rebar, Inc.

Dear Mr. Markowitz:

      We represent United States Rebar, Inc. ("US Rebar") with respect to the Board of
Trustees of the Metal Lathers Local 46 Pension Fund's ("Fund") demand for withdrawal
liability, as set forth in your January 11, 2007 letter to US Rebar. Please consider this letter as
US Rebar's request for reconsideration of the Fund's patently erroneous assessment.

**I.    <u>US Rebar Did Not Incur Withdrawal Liability</u>**

      US Rebar was a construction industry employer that permanently ceased covered
operations on or about January 18, 2005, and permanently ceased to have an obligation to
contribute to the Fund when it terminated its collective bargaining agreement with the Metal
Lathers Local 46 ("CBA") on or about June 30, 2005. As such, US Rebar could not, as a matter
of law, incur withdrawal liability from the Fund unless it (or some portion of its pre-withdrawal
control group) (a) continued to perform work in the jurisdiction of the CBA of the type for which
contributions were previously required, or (b) resumed such work within five years after the date
on which its obligation to contribute ceased, but does not renew that obligation at the time of the
resumption. See Section 4203(b)(2) of ERISA.

      Your January 11, 2007 letter wrongly claims that US Rebar incurred withdrawal liability
under Section 1383(b)(2) of ERISA on the basis that "US Rebar and or its affiliated or controlled
concerns continues to perform work of the prior collective bargaining agreement of the type for
which contributions were previously required."

      First, US Rebar has not performed any work within the jurisdiction of the CBA of the
type for which contributions were previously required since on or about January, 18 2005, and in

fact, has not operated at all since late 2005. See the Declaration of Charles Doherty attached hereto.

Second, no entity within the US Rebar control group has performed work within the jurisdiction of the CBA of the type for which contributions were previously required since US Rebar ceased performing such work in January 2005. Charles Doherty and James Wilson formed, and each owned 50% of, US Rebar, United States Rebar of New Jersey, Inc. ("NJ Rebar") (which ceased operations in 2003), and New York Rebar Supply, Inc. (NY Rebar") Upon Mr. Wilson's untimely death in July 2004, however, Mr. Wilson's estate succeeded to Mr. Wilson's 50% interests in US Rebar, NJ Rebar, and NY Rebar. See the attached Declaration of Charles Doherty.

Since Mr. Wilson's death, Mr. Doherty has not owned any trades or businesses with Mr. Wilson's personal representative or his heirs other than US Rebar, NJ Rebar, and NY Rebar. See the attached Declaration of Mr. Doherty. Accordingly, as of June 30, 2005, the US Rebar control group consisted solely of US Rebar, NJ Rebar, and NY Rebar, and that control group has not performed any work within the jurisdiction of the CBA of the type for which contributions were previously required since on or about January 18, 2005.

Third, your January 11, 2007 letter wrongly suggests that US Rebar incurred withdrawal liability because some unnamed "affiliates" continue to perform work in the jurisdiction of the CBA. Although your January 11, 2007 conspicuously fails to identify the "affiliates," the simple truth is there are no other "affiliates" whose work could give rise to such withdrawal liability.

As mentioned above, Mr. Wilson's estate does not hold any ownership interest in any trades or businesses with Mr. Doherty other than US Rebar, NJ Rebar, and NY Rebar. Thus, as a matter of law, in the absence of participation by Mr. Wilson's estate, no business Mr. Doherty independently owns or has owned (including a proprietorship) could be part of the US Rebar/NJ Rebar/NY Rebar control group. As a result, even if Mr. Doherty established a new business that worked in the jurisdiction of the CBA of the type for which contributions were previously required, that new business could not give rise to the withdrawal liability the Fund assessed against US Rebar under Section 4203(b) of ERISA.

Accordingly, the Fund wrongly assessed withdrawal liability against US Rebar and US Rebar requests that the Fund reconsider and revoke the same.

## II.    The Fund's Assessment is Incorrect

Your January 11, 2007 letter did not provide any information regarding how the Fund calculated the assessed withdrawal liability. Nonetheless, the assessment appears to be incorrect in at least two respects.

First, under Section 4219 of ERISA, the Fund's withdrawal liability assessment must be in the form of a demand for a lump sum amount or, in the alternative, a demand for amortized annual payments (paid quarterly) that have been calculated pursuant to a prescribed formula and paid out over a period not to exceed 20 years. Your January 11, 2007 letter, however, demands

"monthly" payments rather than "quarterly" payments, and the "monthly" payments do not appear to have been determined under the prescribed amortization formula.

Second, your January 11, 2007 letter fails to identify the amortized amount that can be prepaid in a lump sum, as required by Section 4203(c)(4).

Accordingly, given the Fund's failure to provide any supporting calculations for its assessment, US Rebar disputes the propriety of (a) the Fund's initial determination of the amount of the withdrawal liability, (b) the Fund's calculation of the amortization payment schedule, and (c) the Fund's failure to provide a lump sum prepayment amount, and requests immediate reconsideration and revocation of the same.

### III.   Request For Information

Given the absence of information in your January 11, 2007 letter, US Rebar hereby requests the following information:

1.   A detailed explanation of how the Fund calculated the withdrawal liability, including the contribution history for US Rebar that the Fund used, the total employer contribution history that the Fund used, and the unfunded vested benefits figures that the Fund used for each year to determine US Rebar's share of the unfunded vested liabilities.

2.   A detailed explanation of how the Fund calculated the amortization schedule, including the contribution and rate history used, and the impact of the 20-year cap.

3.   An identification of the lump sum payment that should be available to US Rebar and how it was calculated.

4.   A copy of the Fund's annual reports for the past three years.

5.   A copy of the Fund's procedures, if any, for calculating and assessing withdrawal liability.

6.   Copies of any notices or other communications the Fund sent to employers in the past three years regarding the funded status of the Fund and/or withdrawal liability.

7.   A detailed explanation as to the basis for concluding that US Rebar incurred withdrawal liability, i.e., a detailed explanation of what entities the Fund believes are operating in the jurisdiction of the CBA and what evidence the Fund has to show that they are part of the US Rebar/NY Rebar control group.

IV.    **Preservation of Rights**

Given the limited information provided by your January 11, 2007 letter, US Rebar hereby reserves the right to supplement this request for review and to raise new or different issues once it receives the requested information.

If you have any questions, please contact me.

Sincerely,

James J. Sullivan, Jr.

JJS/cm
Enclosure

cc:    David Laurent, Esquire
       Charles Doherty

## DECLARATION

I, Charles Doherty, being subject to the penalties of perjury, hereby state that the following facts are true and correct to the best of my knowledge, information, and belief.

1.     I am the President of United States Rebar, Inc. ("US Rebar), New York Rebar Supply, Inc. ("NY Rebar"), and United States Rebar of New Jersey, Inc. ("NJ Rebar"), and have been President of each such entity since before January 1, 2004.

2.     James Wilson, an adult who is not related to me in any way, and I formed US Rebar, NY Rebar, and NJ Rebar and until July 2004, each of us owed 50% of the stock of each such entity.

3.     James Wilson died in July 2004. Since then Mr. Wilson's 50% interest in US Rebar, NJ Rebar, and NY Rebar has been held by Mr. Wilson's personal representative (Mr. Wilson's estate is being probated by the Public Administrator in Surrogate's Court and to the best of my knowledge, his interest in US Rebar, NJ Rebar, and NY Rebar has not yet been distributed to any of his heirs).

4.     Since Mr. Wilson died in July 2004, I have not owned or operated any trade or business in which Mr. Wilson's personal representatives or his heirs have owned any part or played any role other than US Rebar, NJ Rebar, and NY Rebar.

5.     NJ Rebar permanently ceased operating in 2003.

6.     US Rebar permanently ceased operations covered by its collective bargaining agreement with the Metal Lathers Local 46 ("Union") on or about January 18, 2005, and it permanently ceased all operations in Spring 2005.

7.     NY Rebar was a fabricator and never performed work covered by the collective bargaining agreement between US Rebar and the Union. In any event, NY Rebar also permanently ceased all operations in late 2005.

_____
Charles Doherty

_____
1/31/07
Date

**EXHIBIT C**



LAW OFFICES

MARKOWITZ & RICHMAN

1100 NORTH AMERICAN BUILDING
121 SOUTH BROAD STREET
PHILADELPHIA   PENNSYLVANIA  19107

(215) 875-3100
TELECOPIER (215) 790-0668
WWW.MARKOWITZANDRICHMAN.COM

DIRECT DIAL
215-875-3111

March 13, 2007

RICHARD H MARKOWITZ *
STEPHEN C RICHMAN *
PAULA R MARKOWITZ
QUINTES D TAGLIOLI
JONATHAN WALTERS + +
ANTHONY C BUSILLO II
THOMAS H KOHN ***
RUTH SKOGLUND
R MATTHEW PETTIGREW JR **
PETER H DEMKOVITZ +
MATTHEW D AREMAN +

* ALSO ADMITTED IN NEW YORK
   AND DISTRICT OF COLUMBIA
+ ALSO ADMITTED IN NEW JERSEY
++ ALSO ADMITTED IN DISTRICT OF COLUMBIA
** ALSO ADMITTED IN NEW JERSEY AND NEW YORK
*** ALSO ADMITTED IN VIRGINIA
   AND DISTRICT OF COLUMBIA

ALLENTOWN OFFICE
SUITE 200 COMMONWEALTH BLDG
512 HAMILTON STREET
ALLENTOWN, PA 18101-1505
(610) 820-9531

NEW JERSEY OFFICE
24 WILKINS AVENUE
HADDONFIELD, NJ 08033
(856) 616-2930

NEW YORK OFFICE
880 THIRD AVENUE
NINTH FLOOR
NEW YORK, NY 10022
(212) 752-6761

HARRISBURG OFFICE
27 SOUTH ARLENE STREET
P.O. BOX 6865
HARRISBURG, PA 17112-6865
(717) 541-9475

*File No  PJ-46-02*

James J. Sullivan, Jr , Esquire
Buchanan, Ingersoll & Rooney, PC
1835 Market Street, 14th Floor
Philadelphia, PA  19103-2985

Re:    Withdrawl Liability Determination – United States Rebar Inc., et al
       <u>Metal Lathers Local 46 Pension Fund</u>

Dear Mr. Sullivan:

The Metal Lathers Local 46 Pension Fund has reviewed and considered your
request for reconsideration of the Funds termination of withdrawl liability for your client
United States Rebar, Inc. and its controlled roof of concerns.  The Pension Fund denies
your request.

It is the understanding of the Pension Fund that entities controlled and operated
by United States Rebar, and its subsidiaries and affiliates, continue to perform the same
or similar work covered by US Rebar, Inc.'s former collective bargaining agreement with
Local 46 without any obligation to contribute to the Pension Fund and without such work
being covered by any collective bargaining agreement.  Such work was performed on a
number of jobs in New York City, and the performance of such work gives rise to the
withdrawl liability provided for in the Multi Employer Pension Plan Amendments Act of
1980.

Pursuant to your request, I am enclosing herewith a copy of the actuarial
calculations of such withdrawl liability made by the Pension Fund's Actuary, The Segal
Company.  These calculations disclose that the total withdrawl liability is $3,408,247.00
which may be satisfied by monthly payments of $132,043.82 with a final payment of
$31,609.00.

James J. Sullivan, Jr., Esquire
March 13, 2007
Page 2


     I trust that the enclosed calculation answers your questions as to how the withdrawl liability was calculated and specifies the lump sum payment and the monthly payments to satisfy that obligation.

Very truly yours,

RICHARD H. MARKOWITZ

RHM/kb
Enclosure

METAL LATHERS
LOCAL 46 PENSION FUND

Report On Employer
Withdrawal Liability

United States Rebar

Copyright © 2007
The Segal Group, Inc.,
The Parent of The Segal Company
All Rights Reserved

**METAL LATHERS LOCAL 46 PENSION FUND**
Withdrawal Liability for United States Rebar
Withdrawal Date: July 1, 2005

I     General - Amount Of Withdrawal Liability

When an employer withdraws, the Plan's Trustees must determine the amount of the employer's withdrawal liability. This is based essentially on the extent of the Plan's unfunded vested benefits at the time of withdrawal. The withdrawal formula assigns a share of that unfunded liability to the employer that has withdrawn.

The Trustees of Metal Lathers Local 46 Pension Fund have adopted the statutory formula provided in the Multi-employer Pension Plan Amendments Act of 1980.

The statutory formula distinguishes between the employers who are participating now and employers who participate in the future. It prorates the current unfunded liability for vested benefits only among employers currently contributing. To be more specific, the unfunded vested liability as of December 31, 1979 is prorated among employers contributing during 1980 (on or after September 26). The proration for each employer is based on its contributions in relation to the total made by all continuing employers over the preceding 5 years.

An employer coming into the plan in future years will not have a share, should it withdraw, in liabilities accumulated before it entered. Beginning January 1, 1980, the plan must determine the annual change in its unfunded vested liability. It then prorates each year's change to each of the then-participating employers in proportion to their contributions in the preceding 5 years. If at some point an employer withdraws, the amount of its liability is the sum of what remains of the annual allocations plus the employer's share, if any, of the original December 31, 1979 liability. (Each portion, including the original liability, is reduced to the point of withdrawal by 5% a year.)

II.     Actuary's Assumptions and Methods for Withdrawal Liability Valuations

The actuarial assumptions to be used are the valuation assumptions used for plan funding, except for the investment return rate and the expense charge. To the extent the assets, valued at market, cover the vested benefits, benefits will be valued at an investment return rate consistent with current annuity rates; the portion of the benefit that is not yet funded will be valued on the interest assumptions used for plan funding

Specifically, the withdrawal liability valuation assumptions and methods are:

1.     Investment Return

(a)     To the extent the present value of vested benefits is matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R., Part 4044, which are in effect for the applicable withdrawal liability valuation date plus an adjustment. An adjustment to the PBGC rates is made because our studies indicate that the mortality basis used by the PBGC is not sufficient to reflect current mortality tables used by insurers pricing annuities.

| Plan Year ended December 31 | Immediate annuities | Discount for first 7 years of deferral | Discount for next 8 years of deferral | Discount for deferral beyond 15 years |
|---|---|---|---|---|
| 1985 | 9.00% | 8.25% | 7.00% | 4.00% |
| 1986 | 7.50 | 6.75 | 5.50 | 4.00 |
| 1987 | 8.25 | 7.50 | 6.25 | 4.00 |
| 1988 | 7.75 | 7.00 | 5.75 | 4.00 |
| 1989 | 8.00 | 7.25 | 6.00 | 4.75 |
| 1990 | 8.25 | 7.50 | 6.25 | 4.75 |
| 1991 | 7.50 | 6.75 | 5.50 | 4.75 |
| 1992 | 7.50 | 6.75 | 5.50 | 5.50 |

| Year | Interest Rate During Select Period | Select Period (years) | Interest Rate After Select Period |
|---|---|---|---|
| 1993 | 6.10% | 25 | 5.75% |
| 1994 | 8.00 | 25 | 5.75 |
| 1995 | 6.75 | 20 | 6.50 |
| 1996 | 6.75 | 20 | 5.50 |
| 1997 | 6.35 | 25 | 5.75 |
| 1998 | 6.15 | 25 | 6.00 |
| 1999 | 7.25 | 20 | 6.00 |
| 2000 | 7.75 | 25 | 7.00 |
| 2001 | 7.10 | 20 | 7.25 |
| 2002 | 6.30 | 25 | 5.25 |
| 2003 | 5.70 | 20 | 6.25 |
| 2004 | 4.80 | 20 | 6.00 |

(b)     The portion of the vested benefits that is not matched by plan assets (at market) will be valued on the interest assumption used for plan funding, as of the applicable withdrawal liability valuation date.

| Year | Interest Rate |
|------|---------------|
| 1985 | 7 00% |
| 1986 | 7 00 |
| 1987 | 7 00 |
| 1988 | 7 00 |
| 1989 | 7 50 |
| 1990 | 7 50 |
| 1991 | 7 50 |
| 1992 | 7 50 |
| 1993 | 7 50 |
| 1994 | 7 50 |
| 1995 | 7 50 |
| 1996 | 7 50 |
| 1997 | 7 50 |
| 1998 | 7 50 |
| 1999 | 7 50 |
| 2000 | 7 50 |
| 2001 | 7 50 |
| 2002 | 7 50 |
| 2003 | 7 50 |
| 2004 | 7 50 |

(c)     The portion of the vested benefits that is matched by assets will be determined by comparing the total present value of benefits — at the adjusted PBGC rates — with the total market value of assets; each vested benefit will be treated as covered by assets to the same extent as all other vested benefits.

2.   Mortality
     Same as used for plan funding.

3    Expenses
     No separate expense charge except for that portion of the vested benefits that is matched by assets. For that portion, an expense load equal to that prescribed in Appendix C to PBGC Reg. Part 4044 is used on the basis of the adjusted PBGC interest rates.

4.    <u>Retirement Rates</u>
      Same as used for plan funding.

5.    <u>Unknowns</u>
      Participants with unknown age or service information are assumed to have the same age
      or service distribution as those with known information.

6.    <u>Assets</u>
      Valued at fair market value as reported in the plan's financial statements.

III    Withdrawal Liability Pools

Basic Pools

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 years are detailed in the chart below. Any pools established more than 20 years ago have been fully amortized. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

**Basic Pools as of December 31, 2004**

| Plan Year Ended December 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1985 | $0 | $0 | $0 |
| 1986 | 0 | 0 | 0 |
| 1987 | 0 | 0 | 0 |
| 1988 | 3,156,300 | 3,156,300 | 631,260 |
| 1989 | 3,749,400 | 1,081,600 | 270,400 |
| 1990 | 5,934,600 | 2,444,600 | 733,380 |
| 1991 | 11,115,600 | 5,562,300 | 1,946,805 |
| 1992 | 13,810,700 | 3,354,600 | 1,341,840 |
| 1993 | 18,542,300 | 5,558,800 | 2,501,460 |
| 1994 | 14,608,600 | (2,828,600) | (1,414,300) |
| 1995 | 15,849,400 | 2,204,800 | 1,212,640 |
| 1996 | 18,506,200 | 3,730,500 | 2,238,300 |
| 1997 | 18,728,357 | 1,482,657 | 963,727 |
| 1998 | 15,445,804 | (1,947,790) | (1,363,453) |
| 1999 | 12,812,298 | (1,396,257) | (1,047,193) |
| 2000 | 16,614,158 | 4,579,110 | 3,663,288 |
| 2001 | 24,283,672 | 8,765,904 | 7,451,018 |
| 2002 | 40,734,878 | 18,030,852 | 16,227,767 |
| 2003 | 41,411,713 | 3,365,805 | 3,197,515 |
| 2004 | 57,772,813 | 19,218,359 | 19,218,359 |
| Total | | | $57,772,813 |

<u>Reallocated Amounts</u>

In addition, withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocacted.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the Plan year preceding withdrawal.

As of December 31, 2004 all reallocated amounts have been amortized. There have been no new "uncollectible" liabilities since 1984.

IV.   Withdrawal Liability Calculated Under the Statutory Formula for United States Rebar

Withdrawal Date: July 1, 2005

1.   Change in unfunded present value of vested benefits as of
     December 31, 1988 amortized to December 31, 2004                        631,260

2.   Reallocated uncollectibles for the year ended
     December 31, 1988 amortized to December 31, 2004                               0

3.   Total 1988 liability and uncollectibles
     to be allocated [(1) + (2)]                                            631,260

4.   Total contributions of withdrawing employer
     January 1, 1984 –December 31, 1988                                             0

5.   Total employers' contributions
     January 1, 1984 –December 31, 1988                                     9,735,496

6.   Allocable share of liabilities and uncollectibles
     [(3) x (4) ÷ (5)]                                                            0

7.   Change in unfunded present value of vested benefits as of
     December 31, 1989 amortized to December 31, 2004                        270,400

8.   Reallocated uncollectibles for the year ended
     December 31, 1989 amortized to December 31, 2004                               0

9.   Total 1989 liability and uncollectibles
     to be allocated [(7) + (8)]                                            270,400

10.  Total contributions of withdrawing employer
     January 1, 1985 –December 31, 1989                                             0

11.  Total employers' contributions
     January 1, 1985 –December 31, 1989                                    10,736,296

12.  Allocable share of liabilities and uncollectibles
     [(9) x  (10) ÷ (11)]                                                         0

13.  Change in unfunded present value of vested benefit+s as of
     December 31, 1990 amortized to December 31, 2004                        733,380

14.  Reallocated uncollectibles for the year ended
     December 31, 1990 amortized to December 31, 2004                               0

- 7 -

15. Total 1990 liability and uncollectibles
to be allocated [(13) + (14)]                                          733,380

16. Total contributions of withdrawing employer
January 1, 1986 –December 31, 1990                                          0

17. Total employers' contributions
January 1, 1986 –December 31, 1990                                  11,788,896

18. Allocable share of liabilities and uncollectibles
[(15) x (16) ÷ (17)]                                                       0

19. Change in unfunded present value of vested benefits as of
December 31, 1991 amortized to December 31, 2004                     1,946,805

20. Reallocated uncollectibles for the year ended
December 31, 1991 amortized to December 31, 2004                            0

21. Total 1991 liability and uncollectibles
to be allocated [(19) + (20)]                                        1,946,805

22. Total contributions of withdrawing employer
January 1, 1987 –December 31, 1991                                          0

23. Total employers' contributions
January 1, 1987 –December 31, 1991                                  12,713,196

24. Allocable share of liabilities and uncollectibles
[(21) x (22) ÷ (23)]                                                       0

25. Change in unfunded present value of vested benefits as of
December 31, 1992 amortized to December 31, 2004                     1,341,840

26. Reallocated uncollectibles for the year ended
December 31, 1992 amortized to December 31, 2004                            0

27. Total 1992 liability and uncollectibles
to be allocated [(25) + (26)]                                        1,341,840

28. Total contributions of withdrawing employer
January 1, 1988 –December 31, 1992                                          0

29. Total employers' contributions
January 1, 1988 –December 31, 1992                                  13,131,600

| | | |
|---|---|---:|
| 30 | Allocable share of liabilities and uncollectibles [(27) x (28) ÷ (29)] | 0 |
| 31. | Change in unfunded present value of vested benefits as of December 31, 1993 amortized to December 31, 2004 | 2,501,460 |
| 32. | Reallocated uncollectibles for the year ended December 31, 1993 amortized to December 31, 2004 | 0 |
| 33 | Total 1993 liability and uncollectibles to be allocated [(31) + (32)] | 2,501,460 |
| 34. | Total contributions of withdrawing employer January 1, 1989 –December 31, 1993 | 0 |
| 35. | Total employers' contributions January 1, 1989 –December 31, 1993 | 12,787,500 |
| 36. | Allocable share of liabilities and uncollectibles [(33) x (34) ÷ (35)] | 0 |
| 37. | Change in unfunded present value of vested benefits as of December 31, 1994 amortized to December 31, 2004 | (1,414,300) |
| 38. | Reallocated uncollectibles for the year ended December 31, 1994 amortized to December 31, 2004 | 0 |
| 39. | Total 1994 liability and uncollectibles to be allocated [(37) + (38)] | (1,414,300) |
| 40. | Total contributions of withdrawing employer January 1, 1990 –December 31, 1994 | 0 |
| 41. | Total employers' contributions January 1, 1990 –December 31, 1994 | 12,297,200 |
| 42. | Allocable share of liabilities and uncollectibles [(39) x (40) ÷ (41)] | 0 |
| 43. | Change in unfunded present value of vested benefits as of December 31, 1995 amortized to December 31, 2004 | 1,212,640 |
| 44 | Reallocated uncollectibles for the year ended December 31, 1995 amortized to December 31, 2004 | 0 |

| 45  | Total 1995 liability and uncollectibles<br>to be allocated [(43) + (44)] | 1,212,640 |
| 46. | Total contributions of withdrawing employer<br>January 1, 1991 –December 31, 1995 | 24,409 |
| 47  | Total employers' contributions<br>January 1, 1991 –December 31, 1995 | 11,750,200 |
| 48. | Allocable share of liabilities and uncollectibles<br>[(45) x (46) ÷ (47)] | 2,519 |
| 49. | Change in unfunded present value of vested benefits as of<br>December 31, 1996 amortized to December 31, 2004 | 2,238,300 |
| 50. | Reallocated uncollectibles for the year ended<br>December 31, 1996 amortized to December 31, 2004 | 0 |
| 51. | Total 1996 liability and uncollectibles<br>to be allocated [(49) + (50)] | 2,238,300 |
| 52. | Total contributions of withdrawing employer<br>January 1, 1992 –December 31, 1996 | 56,432 |
| 53. | Total employers' contributions<br>January 1, 1992 –December 31, 1996 | 11,852,600 |
| 54  | Allocable share of liabilities and uncollectibles<br>[(51) x (52) ÷ (53)] | 10,657 |
| 55. | Change in unfunded present value of vested benefits as of<br>December 31, 1997 amortized to December 31, 2004 | 963,727 |
| 56. | Reallocated uncollectibles for the year ended<br>December 31, 1997 amortized to December 31, 2004 | 0 |
| 57. | Total 1997 liability and uncollectibles<br>to be allocated [(55) + (56)] | 963,727 |
| 58. | Total contributions of withdrawing employer<br>January 1, 1993 –December 31, 1997 | 202,264 |
| 59. | Total employers' contributions<br>January 1, 1993 –December 31, 1997 | 12,942,410 |

60. Allocable share of liabilities and uncollectibles
[(57) x (58) ÷ (59)]                                                     15,061

61. Change in unfunded present value of vested benefits as of
December 31, 1998 amortized to December 31, 2004              (1,363,453)

62. Reallocated uncollectibles for the year ended
December 31, 1998 amortized to December 31, 2004                      0

63. Total 1998 liability and uncollectibles
to be allocated [(61) + (62)]                                      (1,363,453)

64. Total contributions of withdrawing employer
January 1, 1994 –December 31, 1998                                 409,190

65. Total employers' contributions
January 1, 1994 –December 31, 1998                               15,013,713

66. Allocable share of liabilities and uncollectibles
[(63) x (64) ÷ (65)]                                                 (37,160)

67. Change in unfunded present value of vested benefits as of
December 31, 1999 amortized to December 31, 2004              (1,047,193)

68. Reallocated uncollectibles for the year ended
December 31, 1999 amortized to December 31, 2004                      0

69. Total 1999 liability and uncollectibles
to be allocated [(67) + (68)]                                      (1,047,193)

70. Total contributions of withdrawing employer
January 1, 1995 –December 31, 1999                                 669,742

71. Total employers' contributions
January 1, 1995 –December 31, 1999                               18,231,684

72. Allocable share of liabilities and uncollectibles
[(69) x (70) ÷ (71)]                                                 (38,469)

73. Change in unfunded present value of vested benefits as of
December 31, 2000 amortized to December 31, 2004               3,663,288

74. Reallocated uncollectibles for the year ended
December 31, 2000 amortized to December 31, 2004                      0

- 11 -

| 75 | Total 2000 liability and uncollectibles to be allocated [(73) + (74)] | 3,663,288 |
| 76 | Total contributions of withdrawing employer January 1, 1996 –December 31, 2000 | 1,138,556 |
| 77. | Total employers' contributions January 1, 1996 –December 31, 2000 | 24,676,997 |
| 78. | Allocable share of liabilities and uncollectibles [(75) x (76) ÷ (77)] | 169,018 |
| 79. | Change in unfunded present value of vested benefits as of December 31, 2001 amortized to December 31, 2004 | 7,451,018 |
| 80. | Reallocated uncollectibles for the year ended December 31, 2001 amortized to December 31, 2004 | 0 |
| 81. | Total 2001 liability and uncollectibles to be allocated [(79) + (80)] | 7,451,018 |
| 82. | Total contributions of withdrawing employer January 1, 1997 –December 31, 2001 | 1,993,534 |
| 83 | Total employers' contributions January 1, 1997 –December 31, 2001 | 32,417,805 |
| 84. | Allocable share of liabilities and uncollectibles [(81) x (82) ÷ (83)] | 458,201 |
| 85. | Change in unfunded present value of vested benefits as of December 31, 2002 amortized to December 31, 2004 | 16,227,767 |
| 86 | Reallocated uncollectibles for the year ended December 31, 2002 amortized to December 31, 2004 | 0 |
| 87. | Total 2002 liability and uncollectibles to be allocated [(85) + (86)] | 16,227,767 |
| 88. | Total contributions of withdrawing employer January 1, 1998 –December 31, 2002 | 3,155,965 |
| 89. | Total employers' contributions January 1, 1998 –December 31, 2002 | 42,218,901 |

90. Allocable share of liabilities and uncollectibles
    [(87) x (88) ÷ (89)]                                        1,213,065

91. Change in unfunded present value of vested benefits as of
    December 31, 2003 amortized to December 31, 2004            3,197,515

92. Reallocated uncollectibles for the year ended
    December 31, 2003 amortized to December 31, 2004                    0

93. Total 2003 liability and uncollectibles
    to be allocated [(91) + (92)]                               3,197,515

94. Total contributions of withdrawing employer
    January 1, 1999 – December 31, 2003                         4,170,575

95. Total employers' contributions
    January 1, 1999 – December 31, 2003                        52,606,221

96. Allocable share of liabilities and uncollectibles
    [(93) x (94) ÷ (95)]                                          253,496

97. Change in unfunded present value of vested benefits as of
    December 31, 2004                                          19,218,359

98. Reallocated uncollectibles for the year ended
    December 31, 2004                                                   0

99. Total 2004 liability and uncollectibles
    to be allocated [(97) + (98)]                             19,218,359

100. Total contributions of withdrawing employer
     January 1, 2000 – December 31, 2004                        4,329,815

101. Total employers' contributions
     January 1, 2000 – December 31, 2004                       61,101,724

102. Allocable share of liabilities and uncollectibles
     [(99) x (100) ÷ (101)]                                     1,361,859

103. Total withdrawal liability: [(6)+ (12) + (18) + (24) + (30) +(36) +
     (42) + (48) + (54) + (60) + (66) + (72) + (78) + (84) + (90) +
     (96) +(102)]                                               3,408,247

104. De minimis deductible                                              0

105. Withdrawal liability, net of De Minimis                    3,408,247

- 13 -

V.    <u>Application of De Minimis Rule for United States Rebar</u>

The amount of liability allocable is reduced by the smaller of:

(1)    ¾ of 1% of the plan's unfunded present value of vested benefits (determined as of the end of the plan year ending before the date of withdrawal) or

(2)    $50,000, reduced by the amount, if any, by which the unfunded vested benefits allocable to the employer exceeds $100,000.

Since the total withdrawal liability before reduction is $3,408,247, the resulting De Minimis amount is $0.

- 14 -

VIII.    Determining Payment and Length of Payment Period for Unites States Rebar

1      Hours of contributions[*] for year ended December 31:

| | |
|---|---|
| 1995 | 11,389 |
| 1996 | 18,473 |
| 1997 | 27,470 |
| 1998 | 54,098 |
| 1999 | 75,081 |
| 2000 | 90,778 |
| 2001 | 139,781 |
| 2002 | 166,016 |
| 2003 | 150,732 |
| 2004 | 44,062 |

2.    Highest consecutive 3-year average units .................................................152,176.33

3.    Highest contribution rate ......................................................................    $10.35

4.    Required annual payment (2) x (3) .....................................................$1,575,025

5.    Net withdrawal liability.........................................................................$3,408,247

6.    Plan Funding investment return assumption ......................................    7.50%

7.    Amount of monthly payment..............................................................$132,043.82


Payment Schedule:

27 monthly payments of $132,043.82 plus final payment of $31,609.00.


6042379v1/02039 001

---
[*]    Determined based on contribution information received from the Fund Office.

- 15 -

# EXHIBIT D

# Buchanan Ingersoll & Rooney PC
Attorneys & Government Relations Professionals

The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801-1054

James J. Sullivan, Jr.
302 552 4202
james.sullivan@bipc.com

T 302 552 4200
F 302 552 4295
www.buchananingersoll.com

March 19, 2007

VIA FACSIMILE AND REGULAR MAIL

Board of Trustees of the Metal Lathers Local 46 Pension Plan
c/o Richard H. Markowitz, Esq.
Markowitz & Richman
1100 North American Building
121 South Broad Street
Philadelphia, PA 9107

Re:     **Request for Information**

Dear Mr. Markowitz:

I am in receipt of the Board of Trustees of the Metal Lathers Local 46 Pension Fund's ("Fund")'s March 13, 2007 denial of United States Rebar, Inc. ("US Rebar") request for reconsideration. Unfortunately, because the Fund's March 13, 2007 denial identifies no facts or law supporting the demand for withdrawal liability, and because I presume that the Fund must be exercising its fiduciary duty in good faith, I hereby request that the Fund promptly provide me with the following information:

1.     Please identify the facts the Fund relies upon for its assertion that there are "entities controlled and operated by United States Rebar, and its subsidiaries and affiliates," including exactly who the entities are and exactly why the Fund claims that US Rebar is controlling or operating them.

2.     Please identify the facts showing that the entities allegedly "controlled and operated" by US Rebar are performing "work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required."

3.     As you know, US Rebar was owned by two people, one of whom died in 2004, and none of the entities that those two individuals owned are still operating. Therefore, any current business owned in whole or in part only by the surviving owner cannot, as a matter of law under the control group principles that are used to identify the employer for purposes of withdrawal liability (29 U.S.C. §1301(b) and Treasury regulations 1.414(b)-1 and 1-414(c)-2), be

Pennsylvania :: New York :: Washington, DC :: Virginia :: Florida :: New Jersey :: Delaware :: Ohio :: California

March 19, 2007
Page 2

in the same control group as US Rebar.  Accordingly, please explain exactly who the Fund is referring to by the phrase, "United States Rebar, Inc. and its controlled group of concerns."

    4.    To the extent the Fund is relying on some theory other than control group, as defined in the foregoing Treasury regulations, to support its demand for withdrawal liability, please identify the legal theory, including all case law and facts supporting the application of that theory here.

    Given the amount of withdrawal liability the Fund is demanding, this is a serious matter that requires prompt attention.  Therefore, please get back to me with the Fund's responses to the foregoing questions by the close of business on Friday, March 23, 2207.  Otherwise, US Rebar will be forced to pursue other options to protect its rights, including, but not limited to, seeking the recovery of its attorneys' fees and costs if the Fund will not rescind its demand for withdrawal liability.

Sincerely,

James J. Sullivan, Jr.

cc:    Charles Dougherty

#1006339-v1

# EXHIBIT E

215-875-3111

March 21, 2007

James. J. Sullivan, Jr., Esquire
Buchanan Ingersoll & Rooney PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE  19801-1054

*Our File No.: P01-46-02*

Re:     United States Rebar, Inc., et al

Dear Mr. Sullivan:

In response to your communication to me of March 19, 2007 the following is a list of concerns related to and controlled by United States Rebar and its principals.  Those concerns are as follows:

American Concrete Structures, Inc.
94 Willis Avenue, Mineola, NY  11501

New York Rebar Supply, Inc.
268 North Main Street, Freeport, NY  11520

New York Rebar Supply, Inc.
256 North Main Street, Freeport, NY  11520

United States Rebar, Inc.
268 North Main Street, Freeport, NY  11520

Rebar Equipment Rental
268 North Main Street, Freeport, NY  11520

Herrara Construction Services
268 North Main Street, Freeport, NY  11520

March 21, 2007
Page 2


      Debt Recovery Group, LLC
      332 North Main Street, Freeport, NY  11520

It is the position of the Metal Lathers Local 46 Pension Fund that all of the above entities are related to and controlled by United States Rebar and its principal.  United States Rebar and one or more of the above entities, all of which we believe are part of a controlled group of concerns with a principal owner, performed work on the following job sites in the year 2006 in New York City:

      194 or 200 Allen Street
      517 West 46th Street
      128 West 29th Street
      450 West 236th Street
      3620 Oxford Avenue, Riverdale
      13th & 14th Streets between Avenue "A" and 1st Ave.
      165 West 18th Street

On all of the above jobs one or more of the concerns controlled by Charles Doherty performed work of the kind previously performed by United States Rebar under its collective bargaining agreement with Local 46.

I might point out that other concerns were under Mr. Doherty's control and were used to perform such work.  Such concerns are known as:

      Merit Rebar
      Rebar Management Solutions
      New York Rebar
      New York Chair and Accessory
      Joseph Kelly Construction Corp.

It is the position of the Metal Lathers Local 46 Pension Fund that United States Rebar Inc. was one of a series of corporations formed and controlled by Charles Doherty.  All of these corporations are related and constitute the controlled group which has performed work leading to the imposition of withdrawal liability upon United States Rebar Inc. and its allied and affiliated concerns.

March 21, 2007
Page 3


      I trust the above comments set forth the position of the Pension Fund.  If you have any questions about my comments, please do not hesitate to let me know.

               Very truly yours,



               **RICHARD H. MARKOWITZ**

RHM/kb

# EXHIBIT F

**Buchanan Ingersoll ⅍ Rooney** PC
Attorneys & Government Relations Professionals

1835 Market Street
14th Floor
Philadelphia, PA 19103-2985
T 215 665 8700
F 215 665 8760
www.buchananingersoll.com

James J. Sullivan
215 665 5341
james.sullivan.biipc.com

April 5, 2007

VIA E-MAIL AND REGULAR MAIL

Board of Trustees of the Metal Lathers Local 46 Pension Fund
c/o Richard H. Markowitz, Esq.
Markowitz & Richman
1100 North American Building
121 South Broad Street
Philadelphia, PA 19107

Re:     Supplemental Request for Reconsideration

Dear Mr. Markowitz:

I am in receipt of your March 21, 2007 letter, wherein you claim, on behalf of the Board of Trustees of the Metal Lathers Local 46 Pension Fund's ("Fund"), that the companies identified in your letter are "are part of a controlled group," and "constitute the controlled group which has performed work leading to the imposition of withdrawal liability." (Emphasis added.) Unfortunately, your premise is factually wrong and unsound as a matter of law.

For purposes of withdrawal liability, the "employer" or "control group" consists of those entities under common control within the meaning of Treasury regulations 1.414(b)-1 and 1-414(c)-2). See Central States v. Creative Development Company, 232 F. 2d 406 (7th Cir. 2000) ("The determination of whether particular entities are in fact controlled group members requires resort to several Treasury Department regulations, among which is one that specifies that a trade or business belongs to a 'brother - sister' controlled group if: (i) the same five or fewer persons who are individuals, estates, or trusts own … a controlling interest in each such organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization.").

"In the case of a corporation, a controlling interest is defined as 'ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote of such corporation …In the case of a partnership, a controlling interest is

Board of Trustees of the Metal
Lathers Local 46 Pension Fund
April 5, 2007
Page 2

defined as 'ownership of at least 80 percent of the profits interest or capital interest of such partnership….". Local 478 Trucking and Allied Industries Pension Fund v. Willard D. Jayne, 778 F. Supp. 1289, 1303 (D. N. J. 1991)

Moreover, "each person whose stock is considered in applying the eighty percent test must own at least one share of stock in each corporation." PBGC v. Ouimet Corporation, 711 F. 2d 1085, 1093 (1st Cir. 1983). (Emphasis added.) See also IUE AFL-CIO Pension Fund v. Barker & Williams, Inc., 788 F. 2d 118, 123 (3d Cir. 1986) ("In United States v. Vogel, 455 U.S. 16, 102 S. Ct. 821, 70 L. Ed.2d 792 (1982), the Supreme Court ruled that each of the five or fewer persons must own some stock in each corporation to meet the 80% test."); 53 Fed. Register 6603 (Mar. 2, 1988) ("These amendments conform the regulations to the decision in United States v. Vogel Fertilizer by the Supreme Court which held that a person's stock ownership is not taken into account for purposes of the 80% control test unless that person owns stock in each corporation of the putative brother-sister controlled group.")

Accordingly, for an entity to be within US Rebar's control group, Mr. Wilson's estate and Mr. Doherty each must own part of the entity, and collectively they must own at least 80% of the entity. In other words, businesses owned solely by Mr. Doherty, by Mr. Doherty and parties other than Mr. Wilson or his estate, or by third parties, cannot as a matter of law be part of US Rebar's control group and, as a result, their activities cannot give rise to an assessment of withdrawal liability against US Rebar.

Enclosed with this letter is a Supplemental Declaration from Mr. Doherty explaining that information the Fund cited in its March 21, 2007 letter to support its assessment of withdrawal liability was incorrect because (1) the entities that are or were in a control group with US Rebar never performed work in the jurisdiction of the CBA of the type for which contributions were previously required after June 30, 2005, and (b) the entity that did perform the work cited in the Fund's March 21, 2007 letter - New York Rebar Installation, Inc. - is and always was owned solely by Mr. Doherty and, therefore, never was or could be in a control group with US Rebar as a matter of law.

Accordingly, the Fund wrongly assessed withdrawal liability against US Rebar. However, if the Fund would like an opportunity to further corroborate the foregoing facts before rescinding the withdrawal liability assessment, then, so long as the Fund is willing to agree to stay the date for making interim withdrawal liability payments, and stay the date for requesting arbitration, I will provide you with such an opportunity. On the other hand, if the Fund refuses to agree to such a stay, then US Rebar will file the enclosed complaint against the Fund seeking a declaration that the Fund assessed this withdrawal liability wrongly and in bad faith, a stay of any arbitration and any interim collection efforts, and requesting an award of attorneys' fees and costs.

Board of Trustees of the Metal
Lathers Local 46 Pension Fund
April 5, 2007
Page 3


　　　　　Please let me know if the Fund wants to pursue an amicable resolution under the
foregoing terms by the close of business on April 11, 2007.



　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　James J. Sullivan


JJS/rsh

## SUPPLEMENTAL DECLARATION

I Charles Doherty, being subject to the penalties of perjury, hereby state that the following facts are true and correct to the best of my knowledge, information, and belief.

1.      James Wilson and I formed and each owned 50% of New York Rebar Supply, Inc. ("NY Rebar"), Rebar Equipment Rental ("Rebar Rental"), and Herrera Construction Services ("Herrera").

2.      NY Rebar was a fabrication shop and retailer that never performed any work in the jurisdiction of the CBA of the type for which contributions were previously required and, in any event, permanently ceased operating in approximately October 2005.

3       Rebar Rental was formed as a corporation, but never operated at all.

4.      Herrera never performed any work in the jurisdiction of the CBA of the type for which contributions were previously required and was dissolved in approximately 2002.

5.      As of the date of this Declaration, Mr. Wilson's estate continues to own 50% of NY Rebar and Rebar Rental.

6.      I formed and own (and have always owned) 100% of American Concrete Structures ("American Concrete"), Debt Recovery Group, LLC ("Debt Recovery"), Rebar Management Solutions (formerly known as Merit Rebar) ("Rebar Solutions"), and New York Rebar Installation, Inc. ("Rebar Installation.").

7       American Concrete was formed as a corporation, but never operated at all.

8.      Debt Recovery purchases distressed debt and manages it and has never performed work in the jurisdiction of the CBA of the type for which contributions were previously required.

9.      Rebar Solutions provides administrative management services (payroll, bookkeeping, etc.) and has never performed work in the jurisdiction of the CBA of the type for which contributions were previously required.

10.     Rebar Installation. is a business that installs rebar; however, unlike US Rebar, Rebar Installation installs rebar after it has been bent at other locations, and works on private projects for private customers that US Rebar never serviced (US Rebar serviced primarily public works projects for public entities). Rebar Installation did perform rebar installation work at each of the locations cited in the Fund's March 21, 2007 letter, but for private customers that US Rebar never serviced.

11.     I do not have any ownership interest in any entity known as New York Chair and Accessory or Joseph Kelly Construction, and neither such entity ever had any ownership interest in US Rebar, NY Rebar, NJ Rebar, and Rebar Rental. Moreover, the only connection any entity I have owned in whole or in part has had with either New York Chair and Accessory or Joseph

Kelly Construction is that the latter rented space at 332 North Main Street, which the same place that Rebar Installation rents space.

_____
Charles Doherty

4/4/07
_____
Date

# EXHIBIT G

LAW OFFICES
## MARKOWITZ & RICHMAN
1100 NORTH AMERICAN BUILDING
121 SOUTH BROAD STREET
PHILADELPHIA, PENNSYLVANIA 19107
——
(215) 875-3100
TELECOPIER (215) 790-0668
WWW.MARKOWITZANDRICHMAN.COM
DIRECT DIAL

215-875-3111

August 1, 2007

RECEIVED

AUG 6 - REC'D

RICHARD H. MARKOWITZ *
STEPHEN C. RICHMAN *
PAULA R. MARKOWITZ
QUINTES D. TAGLIOLI
JONATHAN WALTERS ++
ANTHONY C. BUSILLO II
THOMAS H. KOHN ***
RUTH SKOGLUND
R. MATTHEW PETTIGREW, JR.**
PETER H. DEMKOVITZ +
MATTHEW D. AREMAN +

* ALSO ADMITTED IN NEW YORK
  AND DISTRICT OF COLUMBIA
+ ALSO ADMITTED IN NEW JERSEY
++ ALSO ADMITTED IN DISTRICT OF COLUMBIA
** ALSO ADMITTED IN NEW JERSEY AND NEW YORK
*** ALSO ADMITTED IN VIRGINIA
  AND DISTRICT OF COLUMBIA

ALLENTOWN OFFICE
SUITE 200 COMMONWEALTH BLDG.
512 HAMILTON STREET
ALLENTOWN, PA 18101-1505
(610) 820-9531

NEW JERSEY OFFICE
24 WILKINS AVENUE
HADDONFIELD, NJ 08033
(856) 616-2930

NEW YORK OFFICE
880 THIRD AVENUE
NINTH FLOOR
NEW YORK, NY 10022
(212) 752-6761

HARRISBURG OFFICE
27 SOUTH ARLENE STREET
P.O. BOX 6865
HARRISBURG, PA 17112-6865
(717) 541-9475

__Via Certified Mail No. 7099 3220 0003 6409 1832__
James. J. Sullivan, Jr., Esquire
Buchanan Ingersoll & Rooney PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801-1054

*Our File No : P01-46-02*

Re:     **United States Rebar, Inc. and Metal Lathers Local 46 Pension Plan
          Withdrawal Liability**

Dear Mr. Sullivan:

The Trustees of the Metal Lathers Local 46 Pension Fund have carefully reconsidered the assessment of withdrawal liability upon United States Rebar, Inc. originally made in my letter of January 11, 2007 to that concern. The Trustees have conducted an independent investigation and have also reviewed your various communications on this subject and the Declarations of Charles Doherty which you have attached to your communications.

After reviewing all of these communications and Declarations and after considering the results of their own investigation, the Trustees of the Metal Lathers Local 46 Pension Fund have determined that withdrawal liability is due and owing from United States Rebar and/or its principal officer and/or its affiliated and commonly controlled companies. Therefore, the Trustees reiterate their assessment of withdrawal liability against United States Rebar, Inc. and its affiliated or commonly controlled concerns under the Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Multi-Employer Pension Plan Amendments Act of 1980 (MEPPAA). The Trustees have determined that United States Rebar, Inc. instituted a complete withdrawal from a multi-employer pension plan and, through its principal, continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required under the collective bargaining agreement between Metallic Lathers Local 46 and United States Rebar, Inc.

James. J. Sullivan, Jr., Esquire
August 1, 2007
Page 2

As you have previously been advised, the withdrawal liability of United States Rebar, Inc. is $3,408,247.00. This amount is determined based upon United States Rebar's pro rata share of total contributions to the Plan during the ten (10) years ending on December 31, 2004. I have previously forwarded to you a copy of the actuarial calculations reaching this conclusion. The liability of United States Rebar, Inc. may be satisfied by monthly payments for twenty-seven (27) consecutive months in the amount of $132,043.82 plus a final payment of $31,609.00.

This communication constitutes the final decision of the Metal Lathers Local 46 Pension Fund on U.S. Rebar's request for reconsideration pursuant to the agreement to extend the time for such reconsideration set forth in your communication to me of April 13, 2007 and my communication to you of April 18, 2007. It is the position of Metal Lathers Local 46 Pension Fund that the time constraints set forth in ERISA, as amended by MEPPAA, shall begin as of the date of this communication. Accordingly, the due date of the first payment is sixty (60) days from the date of your receipt of this communication.

Very truly yours,

RICHARD H. MARKOWITZ

RHM/kb