Appendix, Exhibit 12 (Stipulation). On July 29, 2008, the Trustees signed and delivered the Release, as required by the Settlement Agreement. Appendix Exhibit 3 (Release).

## III.    MATERIAL FACTS

### A.    US Rebar's Collective Bargaining Agreement

US Rebar signed several collective bargaining agreements with Local 46 (the "Union"), each of which obligated US Rebar to contribute certain amounts to the Fund based on the hours worked by its Union-represented employees; however, US Rebar terminated its last collective bargaining agreement with the Union effective as of June 30, 2005. Appendix, Exhibit 13 (US Rebar's termination notice dated February 24, 2005). Thereafter, US Rebar lawfully refused to negotiate a successor agreement with the Union. Appendix, Exhibit 14 (US Rebar's letters to the Union dated April 6, April 18, April 21, and April 28, 2005). The Union challenged the validity of US Rebar's conduct by filing an unfair labor practice change; however, the Union eventually withdrew the charge. Appendix, Exhibit 15 (Unfair Labor Practice Charge and corresponding approval of the withdrawal of the Charge).

Accordingly, there can be no dispute that neither US Rebar, nor its alleged alter ego NY Rebar, has had any obligation to contribute to the Fund under any collective bargaining agreement for work performed after June 30, 2005.

### B.    The Assessment of Withdrawal Liability

By letter dated January 11, 2007, the Trustees assessed withdrawal liability against US Rebar, claiming that US Rebar withdrew from the Fund on July 1, 2005. On August 1, 2007, the Trustees rejected US Rebar's request for reconsideration and reaffirmed the assessment of withdrawal liability. Appendix, Exhibit 4. (Trustees' withdrawal liability correspondence to US Rebar).

C.    **The Criminal Case**

On or about June 30, 2005, the United States Attorney's Office for the Eastern District of New York filed criminal information against Doherty, alleging, among other things, that Doherty, through US Rebar, had engaged in a money laundering conspiracy between approximately January 1, 1998 and July 31, 2002, related to a check-cashing scheme intended to pay US Rebar's employees in cash "off the books".  Appendix, Exhibit 16 (Information).  On September 12, 2005, Doherty pled guilty to one count of a money laundering conspiracy.  Appendix, Exhibit 10 (Doherty Aff. at ¶5).

D.    **The Delinquent Contribution Lawsuit[3]**

The Trustees filed the Delinquent Contribution Lawsuit against US Rebar on or about May 17, 2005.  Notably, the Trustees did not sue Doherty.  Appendix, Exhibit 17 (Delinquent Contribution Lawsuit Docket Sheet).

In the days and weeks following Mr. Doherty's guilty plea, the Trustees and their agents repeatedly communicated both their knowledge of that guilty plea and their threat to assert RICO claims against Doherty and US Rebar if their settlement demands in the Delinquent Contribution Lawsuit were not met.  These communications included:

- In late September 2005, Mr. Kaming told Mr. Rabinowitz at a conference before a Magistrate that "the Funds were aware that Doherty had a pending criminal matter." Appendix, Exhibit 9 (Rabinowitz Aff. at ¶4).

- At a meeting in early October 2005, attended by Thomas E. McDonagh, US Rebar's accountant, Mr. Kaming, and plaintiffs' accounting firm, Audit Associates, Mr. Kaming threatened Mr. McDonagh that if US Rebar did not accept plaintiffs' audit conclusions, plaintiffs would imminently file a RICO suit against US Rebar and

---

[3]  Given that the Trustees just abandoned the RICO Lawsuit in the face of US Rebar's and Charles Doherty's evidence that they knew of the cash payments when they signed the Settlement Agreement, Doherty assumes that the Trustees will not again attempt to challenge the validity of the Settlement Agreement and Release.  Out of an abundance of caution, however, Doherty is attaching the affidavits and declarations his counsel served on opposing counsel in the RICO Lawsuit in the event the Trustees attempt to resurrect that issue.

Mr. McDonagh personally.  Appendix, Exhibits 10 (Doherty Aff. at ¶10); Exhibit 11 (McDonagh Aff. at ¶¶4-5);

- In late October 2005, a Business Agent for the Union (and a Trustee herein), Fred Lemoine, reiterated to Michael Doherty, Doherty's brother, specific details of the criminal case, including the fact that Doherty was to be subjected to a $500,000.00 forfeiture to the government within the next month.  Appendix, Exhibit 10 (Doherty Aff. at ¶11).

- In January 2006, while attending a reception at the Las Vegas Hilton during the World of Concrete convention, Doherty spoke with another Union Business Agent (and another Trustee herein), Terrence Moore.  Mr. Moore told Doherty that he "knew about [his] money laundering conviction" and that he knew that Doherty was "talking to the Government about Local 46."  Appendix, Exhibit 10 (Doherty Aff. at ¶12).

- At numerous times during settlement negotiations between counsel, which commenced in February 2006, Mr. Kaming threatened US Rebar and Doherty with additional legal action, including civil RICO claims.  Appendix, Exhibit 9 (Rabinowitz Aff. at ¶¶4, 9, and 18).

Prior to settling the Delinquent Contribution Lawsuit, the Trustees were thus acutely aware of two things: (1) that Doherty had just pled guilty to a money laundering conspiracy related to paying employees in cash and "off the books;" and (2) that they could have alleged fraud and claimed additional contributions in the Delinquent Contribution Lawsuit.

### E.    The Settlement Agreement and the Release

Against the backdrop of the criminal matter and the Trustees' overt threats, counsel for the parties nevertheless continued to discuss a possible settlement of the Delinquent Contribution Lawsuit.  Appendix, Exhibit 9 (Rabinowitz Aff. at ¶6); Exhibit 10 (Doherty Aff. at ¶¶13, 14) Ultimately, on March 10, 2006, the Trustees, US Rebar, and Doherty executed the Settlement Agreement and the Court approved the same to resolve the Delinquent Contribution Lawsuit. Appendix, Exhibit 2.  Among other things, the Settlement Agreement provided that the caption would be amended to add Doherty as a defendant and that Doherty personally guaranteed the payment of the settlement amount.  Appendix, Exhibit 2, ¶¶1A and 8.

Thereafter, US Rebar and/or Doherty made each settlement payment on or ahead of schedule and ultimately paid the balance in full ahead of schedule by delivering the payment to the Trustees' counsel (as an escrow agent) on November 27, 2007. By agreement of the parties, the Trustees' counsel released the final payment to the Trustees on July 14, 2008. Appendix, Exhibit 10 (Doherty Aff. at ¶20; Exhibit 18 (Rabinowitz letter to Kaming and Kaming letter to Rabinowitz). On July 29, 2008, the Trustees executed the Release. Appendix, Exhibit 3 (Release).

### F.    **The Trustees' Counterclaim**

The Trustees' Counterclaim in this case alleges in pertinent part as follows:

61.    Doherty has acknowledged under oath that between 1997 and into mid-2003, he orchestrated a criminal scheme to pay US Rebar's Union workers a substantial portion of their wages in cash. Doherty's admitted purpose in perpetrating the unlawful scheme was to avoid having to make the CBA-mandated benefit payments to, and fraudulently conceal the non-payment of such benefits from, the Plan.

****

65.    In or about late 2004, and as further part of his extended and continuing scheme to defraud the Plan, Doherty formed NY Installation. Doherty formed NY Installation as an alter ego of US Rebar under a different name and using non-Union labor, all in an effort to conceal and disguise from the Plan the fact that withdrawal liability had been incurred ….

****

88.    Under ERISA, as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381 - 1453, the term "employer" means a person who is obligated to contribute to a multiemployer pension plan.

89.    Beginning in or about 1994 and at all time relevant herein, US Rebar was obligated to contribute to the Plan. Therefore, US Rebar was an "employer" within the meaning of ERISA, as amended by MPPAA.

90.    At all times relevant herein, Doherty was a corporate officer of and exercised total operational control over US Rebar and its alter-ego NY Installation.

- 8 -

91.     At all times relevant herein, Doherty was directly responsible for US Rebar's and its alter-ego NY Installation's failure to make contributions to the Plan, in accordance with the terms and conditions of the CBA.

92.     At all relevant times herein, Doherty has exercised his total operational control over US Rebar and its alter-ego NY Installation in a fraudulent, criminal, and otherwise illegal manner, all as part of his continuing efforts to defraud the Plan.

93.     Accordingly, in addition to US Rebar and its alter-ego NY Installation, Doherty was also an "employer" within the meaning of ERISA, as amended by the MPPAA, and, as such, is jointly and severally liable with US Rebar and NY Installation for the Withdrawal Liability.  (Emphasis added.)

Appendix, Exhibit 1 (Counterclaim).

IV.    **STANDARD OF REVIEW**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  The Court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Although the Court is required to view the evidence in the light most favorable to the nonmoving party, *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995), the non-moving party cannot rest "merely on allegations or denials" but must instead "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e); *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (non-moving parties "may not rely on conclusory allegations or unsubstantiated speculation") (internal quotation marks omitted), *cert. denied,* 534 U.S. 891 (2001); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (non-movant "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial'").  No genuine issue exists "unless there is sufficient evidence favoring the nonmoving

party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## V.    ARGUMENT

Count II of the Complaint fails to state a claim against Doherty because, as a matter of law, controlling shareholders and officers of a corporate employer that withdraws from a multiemployer pension plan cannot be held personally for responsible for the withdrawal liability on the theory that they too are "employers."  Moreover, even if the Trustees could establish that Doherty is an "employer" for purposes of collecting withdrawal liability based on his conduce before June 30, 2005, the broad, unambiguous language of the Settlement Agreement and the Release bar them from asserting that claim.  Finally, there are no facts after June 30, 2005 that could support the Trustees assertion that Doherty is an "employer" for purposes of collecting US Rebar's withdrawal liability.  Accordingly, the Court should grant partial summary judgment in favor of Doherty and dismiss Count II of the Trustees' Counterclaim.

### A.    Controlling Shareholders and Officers Are Not "Employers" for Purposes of Collecting Pension Plan Withdrawal Liability

As set forth more fully below, Doherty cannot be considered an "employer" for purposes of collecting withdrawal liability as a matter of law.

#### 1.    The General Rule

Title IV of ERISA, as amended by Multiemployer Pension Plan Amendments Act, 29 U.S.C. §§ 1381 *et seq* , does not define the term "employer."  Moreover, although Title I of ERISA defines the term "employer," that definition does not apply to withdrawal liability under Title IV.  Title I of ERISA states that "[f]or purposes of this title," the term "employer" means "any person acting directly as an employer, or indirectly in the interest of an employer," and the

term "person" means "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, associate, or employee organization." 29 U.S.C. §§ 1002 (5) and (9). Significantly, neither the term "employer" nor the term "person" includes corporate shareholders or officers.

Moreover, in *Nachman Corp. v. Pension Benefit Guarantee Corp.*, 446 U.S. 359, 370 n. 14 (1980), the Supreme Court observed that because Congress made some Title I definitions applicable to Title IV, but not others, "[t]his specific incorporation suggests that Title I definitions do not apply elsewhere in the Act of their own force..." Thus, Title I's definition of the term "employer" does not apply to withdrawal liability. *Korea Shipping Corp. v. New York Shipping Association,* 880 F. 2d 1531, 1536 (2d Cir. 1989). Instead, for purposes of withdrawal liability, the Court of Appeals for the Second Circuit has determined that term "employer" means "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *Korea Shipping*, 880 F. 2d. at 1537.

Nonetheless, courts across the country have uniformly ruled that for purposes of withdrawal liability, the term "employer" <u>does not</u> include a controlling shareholder or officer of a corporation that had an obligation to contribute to a plan. *See Scarbrough v. Perez,* 870 F. 2d 1079, 1084 (6th Cir. 1989) ("Nothing in the either the language or the purpose of the 1980 amendments by which this section [1381] was added can justify the compromise that the plaintiff would have us make in the corporate principle of limited liability."); *DeBrecceni v. Graf Brothers Leasing, Inc.*, 828 F. 2d. 877, 878 (1st Cir. 1987) ("We conclude that under the general purposes of the Multi-Employer Pension Plan Amendments Act of 1980 ('MPPAA'), individual liability for corporate withdrawal liability should be governed by general principles of corporate law."); *Connors v. P & M Coal Co.,* 801 F. 2d 1373, 1378 (D.C. Cir. 1986)("[W]e conclude that

it was error for the district court to hold that Daugherty and Hall are statutory employers within the meaning of Title IV."); *Canario v. Lidelco, Inc.,* 782 F. Supp. 749, 759 (E. D. N. Y. 1992) ("Accordingly, the Court finds that Congress did not intend to impose individual liability for a corporation's withdrawal liability absent circumstances which would permit a 'piercing of the corporate veil.'"); *Glover v. S. D. R. Cartage Company, Inc.,* 681 F. Supp. 1293, 1297 (N. D. Ill. 1988) ("Consequently, we hold that the Baliches are not liable for S. D. R.'s withdrawal liability payments solely due to their positions as controlling stockholders and officers."); *Sun-Up Coal Co., Inc.,* 634 F. Supp. 13, 17 (D. C. D. C. 1985) ("There is nothing in the statutory language or legislative history which indicates that Congress intended the corporate identity to be disregarded and corporate officers and shareholders held personally liability for withdrawal liability.").

Additionally, the Pension Benefit Guaranty Corporation ("PBGC") reached the same conclusion. In *Opinion Letter 83-038*, a copy of which is attached hereto as Exhibit 1, the PBGC stated that "[w]ith regard to your question as to individual shareholder responsibility for withdrawal liability, ERISA has no special rules regarding shareholder or officer liability. Accordingly, this issue is usually determined by State Law, which generally provides that shareholders are not liable for the debts of a corporation."

**2.      The Second Circuit's decision in *Leddy* does not apply to withdrawal liability.**

The Court of Appeals for the Second Circuit has not yet ruled on whether, for purposes of collecting withdrawal liability, the term "employer" includes a controlling shareholder or officer of a corporate employer that withdrew from the plan; however, the Court has ruled that for purposes of collecting delinquent contributions under Section 502 of ERISA, 29 U.S.C. § 1132, a controlling corporate official who criminally defrauds or conspires to defraud a benefit fund to