releases).

At a bare minimum, the allegations in the Amended Complaint are sufficient to permit the Union to test its claims through discovery. The precedent on which Defendants rely concurs. In *Calcutti*, the court declined to rule on the effect of an allegedly general release, instead permitting further discovery on the applicability and legality of the release. 273 F. Supp. 2d at 499. Similarly, in *Mangini*, the New York Court of Appeals reversed summary judgment granted to defendants on the basis of a release in a medical malpractice case, finding that issues of fact concerning the parties' intention to release unknown injuries required a trial. 24 N.Y. 2d at 568-69. In *Pickwick*, 1994 WL 620950 at *9, the court permitted discovery to proceed before ruling on a dispositive motion. *See also In re Worldcom, Inc.*, 296 B.R. 115, 123-124 (Bankr. S.D.N.Y. 2003) (holding that where claimant in bankruptcy proceeding had not adequately alleged that a prior settlement agreement and release had been fraudulently induced, court could find that agreement and release barred claim without considering extrinsic evidence)[5].

### III. THE AMENDED COMPLAINT ADEQUATELY ALLEGES FRAUDULENT INDUCEMENT.

Defendants specifically attack the sufficiency of the fraudulent inducement claim on two grounds. *First*, they assert that the fraud alleged in the instant action is identical to the fraud

---

[5] The Union disputes Defendants' contention that the language in the Release precludes this lawsuit. The Release cannot be read in isolation; it is part of the Settlement Agreement that the parties executed to settle the Audit Lawsuit. *See* Ex. 1 at Ex. A. The Settlement Agreement contains Defendants' representation that the sums paid pursuant to that agreement "represent payment of *all* amounts owed" to Plaintiffs. *Id.* ¶ 5. Thus, the "matters" contemplated by the Settlement Agreement, and those that would have been released, concern only the issues related to the parties' agreement to make the Union whole with respect to the audit at issue. *Id.* Clearly, the Release cannot be interpreted without reference to the parties' intentions. *Cf. Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293, 299 (S.D.N.Y. 2004) ("The language and context of this release provision are so non-specific that I cannot, on a motion for summary judgment, conclude as a matter of law that plaintiffs intended to release" defendants of liability); *Bushkin, Gaims, Gaines, Jonas & Stream v. Garber*, 677 F. Supp. 774, 776 (S.D.N.Y. 1988) (holding that question whether parties intended to release fraud claims at issue when they executed general release precluded summary judgment).

16

alleged in the Audit Lawsuit so it cannot form the basis of a new claim. Br. at 13-14. *Second,* they contend that Plaintiffs knew of Doherty's conviction and that it related to "a scheme to pay workers off-the-books" when they settled with Defendants, and that, therefore, they could not have reasonably relied upon US Rebar's books and records as a matter of law. Br. at 15-21. As shown below, Defendants are wrong on both fronts.

### A. The Conduct Alleged In The Audit Lawsuit Is Entirely Distinct From The Fraudulent Conduct Alleged In The Amended Complaint.

Defendants try to bring themselves within the rubric of those cases that reject fraudulent inducement claims on the ground that the released and current claims arise from the same fraudulent conduct. Br. at 13-15. Thus, they baselessly assert that the "First Lawsuit was specifically based on defendants' alleged conduct in doctoring the books and records of US Rebar":

> [t]he underlying conduct that led to the First Lawsuit -- that defendants were "cooking the books" to deprive union employees of benefit monies they were owed -- is the very same conduct complained of now, raised in the guise of a fraudulent inducement of a settlement claim.

Br. at 14.

Three separate sources prove this characterization of the Audit Lawsuit is demonstrably false: the complaint filed in the Audit Lawsuit in 2005; the Settlement Agreement; and the Amended Complaint in the instant action, which provides background as to both of the earlier documents. Because the conduct at issue in the previous and instant lawsuits is *entirely distinct*, the authority on which Defendants rely is inapposite.

It is plain from the face of the complaint filed in the Audit Lawsuit that the Union had no knowledge that Defendants had paid Union workers millions of dollars of cash off-the-books or

17

had supplied "doctored" or "cooked" books to its auditors. Ex. 2. In that lawsuit, therefore, the Union *never alleged fraud*. Rather, the Union accepted as reliable the books and records that Defendants supplied and which formed the basis of the audits. The only issue present in the Audit Lawsuit was that, *based on the books and records presented*, Defendants had not made all of the payments required by the applicable CBA. Accordingly, the complaint filed in the Audit Lawsuit alleged four causes of action: two for breach of contract; one for breach of statutory ERISA obligations; and one for an audit. *Id.* ¶¶ 9-26.

The complaint in the Audit Lawsuit itself summarizes the action as follows: "by failing, refusing, or neglecting to submit the required monetary contributions and/or reports," and then to pay the "dues and amount checkoffs" when due, US Rebar breached its obligations. *Id.* ¶ 1. Plainly, there is no hint in the Audit Lawsuit complaint that Plaintiffs knew that Doherty or US Rebar had "doctored" or "cook[ed] the books," Br. at 14, or had paid Union workers millions of dollars in cash off-the-books, all of which are alleged in the Amended Complaint.

The Settlement Agreement in the Audit Lawsuit further corroborates that the conduct and monies at issue in that case were wholly distinct from those in the instant matter. The Settlement Agreement contains a representation by the parties that the agreed amount -- $242,613.09 -- "represents payments of *all* amounts owed by" US Rebar and Doherty "for the period July 1, 2001 through June 30, 2005 under the terms" of the applicable collective bargaining agreements. Ex. 1 at Ex. A ¶¶ 2, 5 (emphasis supplied). This document, then, confirms that, at least as far as the Union was concerned, the only matter at issue was the nonpayment of monies reflected in US Rebar's books and records as determined by the audits.

The Amended Complaint further establishes the distinct conduct at issue in the prior and instant lawsuits by explaining the background of the Audit Lawsuit and the settlement the parties

18

reached. As alleged in the Amended Complaint (which must be accepted as true on this motion), the Audit Lawsuit arose when a review of Defendants' books and records revealed that benefit contributions and other funds were owed to the Union:

> Based on the books and records that Doherty and US Rebar provided to Plaintiffs, and which Doherty and US Rebar represented (and caused others to represent) to be accurate and complete, the outside auditors concluded that US Rebar owed Plaintiffs delinquent benefit contributions and other monies totaling $323,321.27 for the time frame covered by the Audits (the "Audit Balance").

Ex. 1 ¶ 28.

Defendants refused to pay the Audit Balance, so the Union commenced an action in federal court seeking these monies. *Id.* ¶ 30. At all times prior to the execution of the Settlement Agreement, Defendants represented -- and the Union reasonably believed -- that the books and records that formed the basis of the audits contained complete and accurate information concerning US Rebar's employees and payroll. *See, e.g., id.* ¶ 53.

Doherty was convicted of money laundering conspiracy on or about September 12, 2005.[6] *Id.* ¶ 19. Thereafter, Doherty, US Rebar, and the Union executed the Settlement Agreement, dated as of March 10, 2006. Ex. 1, Ex. A at 5. At no time prior to executing the Settlement Agreement did Doherty, US Rebar, or any of their advisors inform the Union that the books and records on which the auditors and the Union had relied (and which formed the basis of the settlement) were bogus and failed to reflect millions of dollars in cash that had been paid to

---

[6] Defendants contend that the Union was "acutely aware prior to settling the Audit Lawsuit of two things: (1) that Charles Doherty had just pled guilty to a money laundering conspiracy relating to paying Union members 'off-the-books' . . . and (2) that they could have alleged [the instant] fraud and violations of RICO in the first lawsuit." Br. at 6. This argument supported *only* by the self-serving assumptions and hearsay contained in the proffered affidavits, which the Union will vehemently dispute at the proper time. On this motion, it is enough that the Amended Complaint specifically denies such knowledge. Ex. 1 ¶¶ 25 and 46.

19

Union workers off-the-books or that the resulting benefit contributions and other payments owed to the Union had not been paid. Ex. 1 ¶¶ 25 and 46. Indeed, in a letter dated December 12, 2005 -- *after* Doherty had been convicted of the money-laundering scheme -- Defendants caused their counsel to fraudulently represent to the Union "that the proposed settlement sum of $220,000 would in fact "place the [Union] *in a whole* position." *Id.* ¶ 34 (emphasis supplied).

The allegations here, in sharp contrast to those in the Audit Lawsuit, allege that Defendants engaged in a money-laundering scheme, whereby Union workers were paid in cash off-the-books to deprive the Union of millions of dollars of benefit and other monies due and owing under the CBA. Ex. 1 ¶¶ 19-25, 33-40, 48-55. There is no overlap whatsoever between the delinquent dues and benefit payments that were at issue in the Audit Lawsuit and Settlement Agreement (both of which flowed from the payroll information that *was* reflected on US Rebar's books and records and that formed the basis of the audit results) and the relief sought in the Amended Complaint (which is based entirely upon Defendants' millions of dollars of cash payments to Union employees, all of which were *omitted* from US Rebar's books and records and not accounted for by the audits). In other words, *this* lawsuit *alone* concerns allegations that Defendants "cooked the books" to hide from the Union the fact that they had paid millions of dollars in cash wages to workers without making the necessary benefit and other contributions to the Union. *See* Br. at 9-10; Ex. 1 at ¶¶ 41-55.[7]

Significantly -- and despite Defendants' attempts to create the appearance otherwise -- this is *not* a case where the Union is seeking to recover additional monies based upon payroll

---

[7] Defendants assert, based solely upon the improperly submitted affidavits, that the Union was aware of the nature and underlying facts surrounding Doherty's criminal case and, thus, knowingly released any fraud claims in connection with settlement of the Audit Lawsuit. Br. at 15-20. As discussed in Part IIIB *infra*, however, this argument is both incorrect and unavailing.

20

information that was made available to them, and which they could have and should have discovered during the audit. Nor is this a case where the Union knew about Doherty's criminal scheme to pay Union workers large sums of cash "off-the-books" but only later discovered that the amount paid was greater than had previously been believed.

The foregoing amply illustrates that, based on the contemporaneous documents and the allegations in the Amended Complaint, as a factual matter, Defendants' assertion that the Audit Lawsuit and the instant action arose from the same "fraud" is unavailing. Moreover, as a legal matter, where, as here, a fraudulent inducement claim alleges conduct distinct from that settled in a prior release, courts will not dismiss on the ground that the claim is barred by a prior settlement. *See, e.g., Urfirer*, 408 F.3d at 724 (holding fraudulent inducement claim was not barred by prior release given in divorce proceeding because fraud was not among issues in divorce proceeding).

The vast disparity in the claims alleged in the Audit Lawsuit and the instant action makes unavailing Defendants' recitation of the general principle that a plaintiff who has settled a fraud claim may not later bring a new claim by asserting that the extent of the fraud was not fully disclosed. Br. at 13 and 20. In each of the cases Defendants cite, there was no real question that "the new fraud [was] a species of the same fraud underlying the original agreement," and thus dismissal was appropriate based on the earlier-executed release. *See Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 527 (2d Cir. 1985) (holding "new" fraud was simply same alleged misrepresentations and omissions by defendant insurer); *DIRECTV Group, Inc. v. Darlene Investments, LLC*, No. 05 Civ. 5819 (WHP), 2006 WL 2773024, *4 (S.D.N.Y. Sept. 27, 2006) (holding "new" fraud was simply continuation of defendant's mismanagement of subsidiary of which plaintiff was aware when settling); *Nycal*, 988 F. Supp. at 306 (holding

21

plaintiff could not re-open settlement simply by alleging a new episode of the same fraud); *RBS Holdings, Inc.*, 485 F. Supp. 2d at 478 (holding "central events" of alleged new claim were known to parties when they executed release).

As the Union neither alleged fraud in the Audit Lawsuit, nor settled any off-the-books cash fraud claims in the resulting Settlement Agreement, the cases cited by Defendants simply do not apply. Moreover, as the Union was unaware of Defendants' fraud, *see* Ex. 1 at ¶¶ 25 and 46, there was no reason for them to "carve out" from the Settlement Agreement a right to sue on the fraud as Defendants suggest. Br. at 15-20. Thus, the authority Defendants cite to this effect is misplaced. *Id.* (*citing DIRECTV*, 2006 WL 2773024 at *4; *Bellefonte*, 757 F.2d at 526); *Dunkin' Donuts, Inc.*, 2006 WL 3725340 at *7).

### B.    Plaintiffs Have Adequately Alleged Reliance.

Defendants' final challenge to the Amended Complaint asserts that the Union "knowingly released" all claims against them, including those based upon their off-the-books cash scheme. Br. at 15-19. Consequently, Defendants argue, the Union cannot allege as a matter of law that it "reasonably rel[ied]" on US Rebar's books and records when settling the Audit Lawsuit. *Id.* at 19-21.

Defendants concede that the only factual support they can muster on this point is the "extrinsic evidence" they submitted in the form of the self-serving affidavits. *See* Br. at 16-18 (describing the representations "set forth at length" in the affidavits). For all the reasons discussed in *Point I, supra,* these affidavits should be disregarded (whether on a motion to dismiss or one for summary judgment).

Even accepting all of the substantive representations in the affidavits as true -- and they most emphatically are not -- the *most* they would establish is that there are factual issues as to

what the Union knew and when. *See JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 407 (S.D.N.Y. 2002) (noting that the Second Circuit has characterized the inquiry into what constitutes reasonable reliance as "always mettlesome because it is so fact-intensive.") (*citing Schaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 98 (2d Cir 1997)). This does not even touch upon the central issue of whether that alleged knowledge was sufficient to create the "knowing waiver" that would support barring the Union from recovering the millions of dollars owed to its members.

Based upon the complaint filed in the 2005 Audit Lawsuit, the Settlement Agreement ending that action, and the Amended Complaint in the instant action -- the only documents properly reviewed on this motion, *Michael Aram*, 2006 WL 510527 at *2 -- the Union has plainly and sufficiently alleged reliance sufficient to survive dismissal. Ex. 1 ¶¶ 48-54. The Amended Complaint expressly alleges that the Union *was not aware* of Doherty's massive off-the-books cash payments to Union workers until September 2007. Ex. 1 ¶ 25; *see also* ¶¶ 41-55. Moreover, as discussed above, the complaint filed in the Audit Lawsuit *accepted* Defendants' books and records as truthful; it did not raise a question about their accuracy and reliability. *See supra* at 17-19. Finally, the Settlement Agreement contains an explicit representation that the amount required to make the Union whole was only $242,613.09, thus further bolstering the notion that the Union, in fact, was unaware it had been defrauded of millions of dollars of benefits and other payments. Ex. 1 at Ex. A ¶ 3. Each of these sources fully supports the Union's contention that *it did not know* about Doherty's massive off-the-books cash payment fraud at the time it entered into the Settlement Agreement.

Given the above, Defendants' legal support for their reliance argument is inapplicable. In each of those cases, courts held that reliance was not justifiable because the claims released in

23

the underlying lawsuit actually did arise -- unlike here -- from the same conduct. *See Finz v. Schlesinger*, 957 F.2d 78, 81-83 (2d Cir. 1992) (granting summary judgment after discovery and holding plaintiff could not bring claim based on eligibility to participate in employer's pension plan where such claim had previously been settled and waiver of right was "knowing and voluntary"); *Dunkin' Donuts*, 2006 WL 3725340 at *8 (refusing to permit presentation of evidence at trial relating to fraud claim settled years before where current claim alleged similar "scheme" that franchisee had deprived franchiser of rights); *Waksman*, 2002 WL 31466417 at *8 (granting summary judgment and dismissing fraudulent inducement claim where litigation between parties had "called into question the veracity of the Defendants' conduct"); *Nycal*, 988 F. Supp. 2d 296 at 307 (S.D.N.Y. 1997) (granting summary judgment after discovery and holding plaintiff who had released fraud claims could not later sue for fraud on the ground that the fraud was not fully disclosed).

Finally, it is worth noting that -- unlike in the instant action -- in each of the above cases, the court permitted discovery to proceed before deciding, *on a fully developed record*, that the release merited enforcement.

24

## CONCLUSION

For the reasons set forth above, Defendants motion should be denied in its entirety.

Dated: February 19, 2008

                  Respectfully submitted,

                  **MARKOWITZ & RICHMAN**
                  Richard H. Markowitz, Esq. (RM 5158)
                  121 S. Broad Street, Suite 1100
                  Philadelphia, PA 19107
                  (215) 875-3100
                  kbrookes@markowitzandrichman.com

                  **LAW OFFICES OF ANDREW J. WEINSTEIN**

                  _/s/ Andrew J. Weinstein_
                  By:  Andrew J. Weinstein, Esq. (AW7395)
                  521 Fifth Avenue, Suite 3300
                  New York, NY 10175
                  (212) 582-8900
                  ajw@weinsteinlaw.net

                  *Attorneys for Plaintiffs*